[760 NYS2d 455]

In the Matter of ROGER A. LEVY, an Attorney, Respondent.
DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST
JUDICIAL DEPARTMENT, Petitioner.

First Department, May 27, 2003

### APPEARANCES OF COUNSEL

*Sherry K. Cohen* of counsel (*Thomas J. Cahill*, attorney), for petitioner.

*Michael S. Ross* for respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent was admitted to the practice of law in the State of New York by the Second Judicial Department on September

18, 1985. Respondent is also admitted in New Jersey. At all times relevant to this proceeding, respondent has maintained an office for the practice of law within the First Judicial Department.

On or about October 30, 2001, respondent was served with a notice and statement of charges which alleged 15 violations of the following Disciplinary Rules: Code of Professional Responsibility DR 1-102 (a) (4), (5) and (7), DR 7-101 (a) (1), and DR 9-102 (a), (b) (1), (c) (4), (d) and (e) (22 NYCRR 1200.3, 1200.32, 1200.46). On or about November 27, 2001, respondent submitted an answer in which he denied most of the charges. Thereafter, the parties executed a prehearing stipulation on or about January 18, 2002, as amended February 28, 2002, in which respondent admitted many of the factual allegations, but denied all but two charges.

Hearings were held before a Referee on February 28, March 18 and April 11, 2002, following which the Referee sustained all of the charges except charges five and fifteen. On July 26, 2002, a sanction hearing was held and, in his report dated October 28, 2002, the Referee recommended a two-year suspension.

The evidence before the Referee established that respondent's attorney escrow account was an IOLA account under the name of Barrister Legal Services, Inc., a professional corporation of which respondent was the sole shareholder. Respondent's business operating account was also under the Barrister name.

In July 1998, a certain Herman Turner who had been arrested in Canada and later detained in Alabama in connection with an alleged tax fraud scheme, contacted respondent to enlist his assistance and/or to obtain an experienced criminal attorney. In September 1998, respondent agreed to hold approximately $69,000 in his "trust" account for Turner to draw on for respondent's representation of Turner. Respondent had also leased office space to Turner from April 1998 through the end of August 1998. Following respondent's appearance on his behalf in federal court in Alabama, Turner decided to retain local counsel and, by letter dated September 21, 1998, directed respondent to release the funds to his new attorney, Susan James. However, respondent believed that he would continue representing Turner in some other respects.

On September 29, 1998, respondent sent Ms. James a check for $25,000 for her legal fees, leaving a balance of $44,923.33 in his escrow account. On October 1, 1998, respondent made a $5,000 ATM transfer from his escrow account to his business

account for his legal fee, leaving a balance of $39,923.33 in the escrow account. When Turner discovered that respondent had only released $25,000 to Ms. James, he directed respondent, by letter dated October 12, 1998, to forward the $39,923 balance to his mother to whom he had granted power-of-attorney. Respondent refused to make this transfer despite repeated written requests by Turner, alleging concerns of money laundering. Subsequently the balance in the escrow account dropped to $25,181.24 on April 12, 1999. Interestingly, Ms. James refused to accept the remaining funds to hold in trust, particularly in light of Turner's eventual restitution agreement with the United States Government.

On October 23, 1998, Turner filed a complaint with the Departmental Disciplinary Committee alleging that respondent had failed to return his funds as directed. In his answer to the complaint, respondent claimed that Turner was only entitled to receive $31,975.75. Around December 1, 2000, after Turner was released from prison, he again wrote respondent demanding the return of $38,000. On or about December 20, 2000, respondent returned only $28,128.87, claiming that Turner was not entitled to any more monies.

The Referee determined that, by refusing to disburse Turner's funds as directed from September 1998 through December 2000, respondent failed to promptly pay or deliver to his client as requested funds in his possession which his client was entitled to receive in violation of DR 9-102 (c) (4); that such conduct reflected adversely on his fitness to practice law in violation of DR 1-102 (a) (7); and that he intentionally failed to seek the lawful objectives of this client through reasonably available means permitted by law in violation of DR 7-101 (a) (1). In addition, the Referee found, that by representing to the Committee on more than one occasion during the course of its investigation that he intended to seek judicial intervention regarding the release of Turner's funds when, in fact, he took no meaningful steps to do so, respondent engaged in conduct prejudicial to the administration of justice in violation of DR 1-102 (a) (5). The Referee further found that, by withdrawing approximately $11,000 from funds held on Turner's behalf in his IOLA account when he knew he did not have Turner's consent or authority, and using the funds for personal and/or business purposes, respondent misappropriated client funds in violation of DR 9-102 (a).

The Referee rejected respondent's defense that he did not return Turner's funds because of his good faith belief that to do

so would subject him to federal money laundering charges on the grounds that: respondent never obtained any evidence that Turner's funds constituted the proceeds of a crime; at no time during the two-year period did respondent ever seek a written opinion from an ethics attorney or bar association about his money laundering concerns; his testimony regarding his own interpretation of the money laundering statute and its applicability to the events was "unpersuasive"; his repeated but unfulfilled promises to the Committee to turn Turner's money over to a court undermined his good faith assertion; and, despite his alleged concerns, respondent still transferred more than $8,000 of Turner's funds to himself for reasons other than his representation of Turner in the federal matter, and ultimately released other funds by a check made payable to a third party.

The Referee found, however, that respondent had not intentionally converted Turner's funds in violation of DR 1-102 (a) (4). Although respondent asserted that Turner authorized or consented to the withdrawals or, in the alternative, he was entitled to make certain deductions from the funds for payment of rent on the leased office space beyond the date of termination of the lease, Turner testified that he did not authorize respondent's deductions for rental payments or for other expenses. The Referee found the evidence regarding the lease extension was inconclusive and determined that respondent's withdrawals were the result of confusion over what type of damages respondent would be entitled to if the lease had been extended, and incorrect accounting of amounts held on Turner's behalf. This finding was expressly conditioned upon respondent's return to Turner of $9,510.02, the total amount of funds respondent improperly withdrew.

The Referee sustained charges alleging that by failing to keep proper bookkeeping records for the funds held in his IOLA account on behalf of Turner, respondent violated DR 9-102 (d), and by failing to maintain his IOLA account under his own name or that of his firm, respondent violated DR 9-102 (b) (1).

The parties stipulated that on or about March 26, 1998, respondent deposited into his IOLA account Turner's check to cover rental payments in the sum of $3,663.66. Between March 31, 1998 and July 16, 1998 (prior to the deposit of Turner's $69,923.33 check), respondent withdrew from the IOLA account $3,363.66 by phone or ATM transfers to his operating account. The Referee found that, by withdrawing about $2,100 from his IOLA account between July 16, 1998 and August 6,

1998, allegedly for matters relating to Turner when, in fact, respondent was not holding any funds on behalf of Turner, respondent misappropriated other client funds from his IOLA account in violation of DR 9-102 (a). The Referee also concluded that by failing to maintain proper bookkeeping records for the funds held for Turner, and any disbursements allegedly made on his behalf between March 26, 1998 and August 6, 1998, respondent violated DR 9-102 (d).

The parties also stipulated that on November 16, 1999, respondent deposited $9,550 into his IOLA account as a retainer from one Dr. Beider for anticipated legal work. By January 5, 2000, respondent had disbursed all but $175.71 of those funds for alleged legal fees and disbursements. Between mid-January 2000 and March 1, 2000, respondent disbursed about $3,000 in additional funds from his IOLA account supposedly relating to Dr. Beider; and on February 17, 2000, respondent drew a check allegedly for this client in the amount of $439.86 made payable to "cash." The Referee concluded that by withdrawing approximately $3,000 from his IOLA account for matters relating to Dr. Beider when, in fact, respondent was not holding any funds on his behalf, respondent misappropriated other client funds from his IOLA account in violation of DR 9-102 (a). It was also found that by writing a check out to "cash" from his IOLA account respondent violated DR 9-102 (e), and by failing to maintain proper bookkeeping records for the funds held on behalf of Dr. Beider, and any disbursements allegedly made on his behalf, respondent violated DR 9-102 (d).

The parties further stipulated that respondent deposited funds in his IOLA account in relation to his representation of a client named Koltun, who was also respondent's subtenant and accountant. On June 24, 1998, the balance of those funds was $200 and respondent withdrew the sum of $3,500, allegedly on behalf of Koltun, leaving a negative balance of $3,300. On July 31, 1998, respondent deposited $6,125 on Koltun's behalf. On November 27, 1998, when the balance for Koltun was still $2,825, respondent withdrew a total of $4,125, by ATM transfers to his business account and by making a check in the amount of $1,625 payable to "Angelo Piazza," allegedly relating to Koltun, leaving a negative balance of $1,300. Thereafter, respondent made three additional withdrawals leaving a total negative balance of $4,880. On August 4, 2000, respondent deposited $7,200 on behalf of Koltun, thereby restoring a positive balance in the sum of $2,320.

The Referee concluded that by withdrawing funds from his IOLA account allegedly for matters for Koltun when, in fact,

respondent was not holding funds on his behalf at the time, and causing negative balances on four different occasions, respondent misappropriated other client funds in violation of DR 9-102 (a).

The Referee did not sustain the charge that respondent intentionally converted a total of $7,580 from his IOLA account via ATM transfers to his business account. The Referee found that there was no evidence to support a finding of dishonest motive or venal intent in respondent's conversion of client funds, rather, the Referee believed it was more likely that respondent's invasions were the result of his failure to maintain accurate bookkeeping and that "[i]t defies logic that Respondent would have jeopardized his career by intentionally converting client funds held in escrow especially while the Committee's investigation relating to the Turner complaint was still pending."

In mitigation, the Referee noted that respondent had recently reimbursed Turner approximately $9,500 that respondent had removed from Turner's escrow without his permission, thereby satisfying the condition set for dismissing one charge. The Referee also considered respondent's testimony that he reorganized his bookkeeping procedures including a monthly account verification by his accountant, respondent's admission of his wrongful conduct, and the testimony of his two character witnesses, respondent's accountant and an attorney, both of whom he has known for over 15 years. Respondent also presented character letters from two attorneys.

In aggravation, the Referee considered respondent's prior admonition for neglect in 1996 and his three-month suspension in 1998 which was imposed as reciprocal discipline based upon New Jersey's suspension of respondent for practicing while on the ineligible list of the Client Protection Fund, failing to maintain business and trust accounts, and failing to maintain a bona fide office in New Jersey.

In arguing in support of a three-year suspension, the Committee pointed to case precedent, respondent's disciplinary record, and that respondent's behavior went beyond poor record keeping to withholding Turner's money for over two years, and his withdrawal of approximately $11,000 of Turner's funds without consent, which was in direct contradiction of his alleged fear about money laundering. On the other hand, respondent proposed a one-year suspension noting that a longer suspension would dissolve his client base and that his extensive work as a Hearing Officer for the Board of Education (about

70% of his time) would more than likely be terminated during the period of suspension as it was when he was previously suspended.

The Referee concluded that a two-year suspension was appropriate, finding that respondent's refusal to return Turner's funds occurred over an extended period of time without justification and his mismanagement of his IOLA account was "pervasive." However, the Referee rejected the Committee's suggestion of a three-year suspension, finding it inconsistent with precedent and noting that respondent has now made full restitution, that he expressed remorse, and that his disciplinary record involved conduct dissimilar to that involved herein.

A Hearing Panel heard oral argument on December 5, 2002 and, in its report dated December 6, 2002, unanimously confirmed the Referee's report and recommendation and agreed that a two-year suspension was appropriate.

The Departmental Disciplinary Committee now seeks an order pursuant to 22 NYCRR 603.4 (d) confirming the findings of fact and conclusions of law set forth in the Hearing Panel's determination, and imposing the sanction of no less than a two-year suspension in the absence of compelling mitigation. The Committee notes that although respondent accepted responsibility for his conduct, he waited until the very end of the liability phase of the hearings to do so.

In response, respondent supports the Committee's motion to confirm the Panel's determination and imposing a two-year suspension.

The Referee's and Hearing Panel's findings of fact and conclusions of law are confirmed inasmuch as they are based on a prehearing stipulation, respondent's admissions during the hearing, and upon evidence in the record that respondent failed to promptly disburse approximately $40,000 in trust funds, misappropriated approximately $11,000 from those funds, failed to keep required bookkeeping records for those client funds and for his IOLA account, improperly disbursed other client funds, failed to maintain his IOLA account under his name or that of his firm, and wrote a check out to "cash" from his IOLA account.

However, we disaffirm the Referee's and Hearing Panel's recommended sanction of a two-year suspension. While this Court has generally imposed a two-year suspension where an attorney failed to keep appropriate records for his escrow account, resulting in nonintentional conversion of funds (see e.g.

*Matter of Tepper*, 286 AD2d 79 [2001]) and where an attorney failed to promptly return client funds held in his escrow account (*see Matter of Corcoran*, 243 AD2d 86 [1998]), this case involves a pervasive pattern of commingling of escrow funds. We consider his continued mishandling of his finances very serious and, although there is no evidence that any client lost money as a result of respondent's conduct or that there was an intent on his part to profit personally, respondent fails to offer a credible explanation for his conduct. While respondent's conduct was not venal, he made full restitution, expressed contrition and cooperated with the Committee, in light of his prior disciplinary record, we deem the appropriate measure of discipline to be a three-year suspension (*cf Matter of Pelsinger*, 190 AD2d 158 [1993]).

Accordingly, the Committee's petition should be granted to the extent of confirming the findings of fact and conclusions of law of the Referee and Hearing Panel and disaffirming the recommended sanction of a two-year suspension, and respondent suspended from the practice of law in the State of New York for a period of three years, and until further order of this Court.

BUCKLEY, P.J., TOM, ANDRIAS, WILLIAMS and FRIEDMAN, JJ., concur.

Respondent suspended from the practice of law in the State of New York for a period of three years, effective June 27, 2003.